IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Erskine, Plaintiff; v. Forrest Fenn, Defendant. | Case No. CV-20-08123-PCT-JJT |

**RESPONSIVE MEMORANDUM TO F. R. C. P. 12(b)(2) JURISDICTION MOTION BY COURT ORDER**

This Responsive Memorandum ("RM") to Defendant's ("Fenn") Jurisdiction Motion necessarily details **new facts, context, and evidence** unavailable at filing of the original Complaint ("OC") and transpiring **after** June 4 OC process service ("Service"). The RM thus **reframes** the jurisdiction issue. To progress to case merits, I make other filings alongside this RM, chiefly a Motion for a Noticed F. R. C. P. ("Rule") 15(d) Supplemental Pleading ("SP, SP Motion"). With the RM I file an incorporated Affidavit ("Second Affidavit") and Exhibits. I incorporate by reference the OC with Affidavit and Exhibits including terms' meanings, and if permitted also the SP Motion and proposed SP, ready to file **promptly**. Given the permissive nature of Rule 15(d) and Fenn's public statement on July 22, I respectfully ask the Court to permit SP filing before Fenn next files so I might update my case including new demands for relief.

**CONTENTS**

1. Case Merits Summary

2. Jurisdiction Argument Summary

3. Events After Service Summary

4. Detail: New Jurisdictional Context with Argument

5. Helpful Timeline

6. Law Memorandum including 28 U. S. C. §1631

7. Summary Response to Declaration of Forrest Fenn

8. Conclusion

## 1. CASE MERITS SUMMARY

Fenn's Quest Poem expresses in writing an open offer unilateral contract of hidden fact. Precluding hoax and inviting Participation, the contract features: obligor, intent, performance instructions, Box consideration, and means of conveyance ("I give you title"), but conspicuously no means of **redemption** (except 'trust Fenn').[1] Fenn commits to entitle the Box to an emergent performing Solver for the act of Location fix, obligating Fenn to Box custody and precluding Box abandonment. Long ago, I evidently performed and Solved. Fenn breaches, passively misrepresenting breach as nonperformance and until Service enjoying fame sponsoring a Quest knowingly misperceived as an 'unsolved' 'scavenger hunt' for an 'abandoned Box.' The crux of breach is that the Quest is Solved, but remains unresolved. Fenn's semantics and evasions aside, Fenn's breach is dull and simple, aiming to defeat contract by petulantly blocking redemption, **pretending breach makes me wrong** — a fact essential both to case merits and to Arizona jurisdiction.

## 2. JURISDICTION ARGUMENT SUMMARY

Arizona is vital to contract operation. Fenn visited Arizona in 2014 for an **Event** to accept and validate a pivotal award, creating the linchpin of Arizona jurisdiction. *True West* CEO and Editor Bob Boze Bell ("Bell")[2] awarded Fenn explicitly for **both the Quest and major publicity, inseparably**. Because of this Arizona publicity and because Fenn won't communicate or connect, Bell became my attempted redemption conduit.

[1] See Exhibit RM1 for one-page summary.

[2] Bell is the 'prominent Arizonan' from OC Note 17. See Exhibit 1.

A June 19 *Inside Edition* interview by *CBS This Morning* host Tony Dokoupil ("Tony," "Tony Interview") provided new facts, context, and evidence sustaining Arizona jurisdiction.[3] Tony authored a 2012 *Newsweek* feature of about four thousand (4,000) words **nationally publicizing** the Quest.[4] Tony enables **benchmarking** Fenn's actions and Quest results between two (2) major publicity relationships, Tony and Bell, with Bell more important. Tony also exposes Fenn's **breach intent** and central goal of **fame**.

Nil redemption provision, or the **redemption gap**, is consistent with breach intent. With vast following invested in a 'scavenger hunt' for an 'abandoned Box,' Fenn won't compromise fame or 'lose face' by admitting contract, Solution, custody mandate, or by curing. Yet **redemption communication** clearly is essential to contract. Through Event publicity, I won informal support from Bell and Bell's agreement to communicate Solution to Fenn. Fenn replied to Bell, but did not cure. Thus Fenn perversely ignores the Solver but prioritizes Bell, favoring both fame and Arizona jurisdiction. Clearly, such jurisdiction stems from Fenn's travel to Arizona to accept Bell's publicity award for a contractual Quest with a devious redemption gap borne of breach intent, affirmed by actual breach by stonewalling me as Solver, leaving me scant means to redemption but to leverage the award-winning Arizona publicity to try to reach Fenn through Bell, or sue. These and **other factors** show **breach coextensive with actual contractual reach.**[5]

---

[3] Plaintiff's Tony Interview transcript is in Exhibit RM2.

[4] All press is in Exhibit RM3.

[5] *Meyers v. Hamilton Corp.*, 693 P.2d 904, 143 Ariz. 249 (1984).

## 3. EVENTS AFTER SERVICE SUMMARY

After June 4 Service, on June 7 and June 8, the *Santa Fe New Mexican* and *NPR*[6] with other major media reported that Fenn 'ended' the Quest, declaring the Box 'found.' On June 16, Fenn released three (3) unpersuasive photos. The June 19 Tony Interview responded incredulously to that release. Counsel then appeared, filing a "Declaration of Forrest Fenn" ("Declaration") dated June 20 referencing both jurisdiction and case merits. Fenn made a July 22 statement oddly unrelated to contract performance that the Box was "found in Wyoming," as locus and means of Box custody are irrelevant so long as obligated fact of custody holds.[7] Including these events after Service in the RM (pending SP filing) cannot prejudice or surprise Fenn, who has firsthand knowledge of them, caused them, or as an experienced public figure earned them by weak credibility.

## 4. DETAIL: NEW JURISDICTIONAL CONTEXT WITH ARGUMENT

The Tony Interview, Declaration Items 11 and 12 ("Item #"), and key OC claims in new context sustain Arizona jurisdiction. As detailed herein, Tony made **three (3) points** of **breach intent, national publicity,** and **Fenn relationship continuity,** and supported **five (5) benchmarks** measuring, valuing, or **qualifying major Quest publicity**.

In the Tony Interview, Tony states: (a) "[Tony does] not believe that that treasure has been found" and "[possibly] what [Fenn is] doing is creating an opening […] to

---

[6] All press is in Exhibit RM3.

[7] To avoid Fenn's semantic confusion aims, the contractual performance criterion or **Location fix is not in Wyoming and remains in Colorado where the OC evidenced.**

complete the rather dark and bizarre plan […] to **entomb** [Fenn himself] with the treasure;" (b) in 2012 Tony spent a week by invitation at Fenn's home interviewing and researching for the *Newsweek* feature, (c) **Fenn was "dying for the publicity," "had no credibility,"** and "no one was paying attention," (d) "[Fenn / Quest] **would not exist as a national story** if [Tony] did not pursue it [in 2012]," (e) Fenn "**wants to be remembered for thousands of years** and [Quest is how]," (f) Tony and Fenn sustain limited contact, but **meaningful enough** that Tony believes the Quest is not a hoax.

First, (c), (b), and (d) affirm that Fenn craved publicity, hosted Tony to get it, and Tony delivered key **breaking national publicity** with an August 2012 *Newsweek* feature. Second, Tony affirms (f) meaningful relationship continuity. Third, Tony affirms in (a) and (e) Fenn's premeditated breach intent, as Fenn wanted **fame**, not Solution. Fenn's overconfidence in redemption unlikelihood came from knowing what Solving truly requires: a Participant must perform Location fix in the vast outdoors, validate Location absent a Box, motivate Fenn to redeem (!), realize hidden fact of contract, and sue when Fenn breaches — all **credibly**? Who would do that? **Well, I did, so, here we are**.

**Publicity** motivated Fenn, drove purposeful actions and relationships, bore results, and drove Participation. In *Merriam-Webster*, "publicity" is **both a means and an end**, "an act or device designed to attract public interest; information with news value issued as a means of gaining public attention or support; or its dissemination, or public attention or acclaim." Participation's **contractual goal was performance** or Solution. But Tony informs that Fenn planned to 'die holding the Box' with **contrary goal of fame**. For

Fenn, Solution wrecks the Quest. But by late 2019, a decade of sustained publicity, serving **both goals**, had attracted reportedly hundreds of thousands of Participants.[8]

In November 2013, *True West* featured the Quest.[9] In March 2014, Fenn traveled to Arizona for Bell's award Event. Fenn's *True West* publicity relationship later acquired a third, contractually operative dimension: in late 2018, though I lacked the Box, Bell validated my Solution **(by critical opinion; Bell lacks insider Quest knowledge)** and agreed to deliver Solution to Fenn on my behalf ("Bell Intermediation"). The redemption gap detailed herein, affirmed by Item 12, made Bell Intermediation key: Fenn seemed unlikely to respond to me, it would be hard for me ever to know why, and Fenn would seem to have any number of readily available excuses for ignoring me. To cover an obvious hypothetical, I knew I wasn't wrong and Bell Intermediation shows that Bell agrees. Bell 'broke through' Fenn's stonewall. Fenn replied to Bell but sustained breach, confirming cause of suit **and** continuous connection between Fenn and Bell — though then, I did not yet discern hidden fact of contract.[10]

---

[8] All press is in Exhibit RM3. See Gray, G.; Nov. 25, 2019; *The Journal of Alta California,* "*The Quest to Find [...] Treasure in the Rocky Mountains.*"

[9] All press is in Exhibit RM3.

[10] See Second Affidavit. Bell is integral and I had hoped to limit exposure of Bell's name in this case. According to Bell, Fenn's response was "Thank you." To review, **Quest contractually**, I'm more important than Bell — I'm the emergent valid claimant. But if Fenn responds to Bell and not me, the Bell publicity relationship Fenn visited Arizona to build is more important to Fenn, **sustaining** Arizona jurisdiction — because as Tony expressed, **Fenn perverts or impedes contract to gain fame by suppressing Solution.**

In Item 11, Fenn affirmed driving to the award Event with grandson — over seven (7) hours from Santa Fe to Tucson, for brief stay — citing this purpose, from Exhibit 1:

> The award is handed out in recognition of an individual for his contribution to and preservation of America's Western heritage.

From Fenn, those are empty words. It's generically why any *True West* annual award winner wins. Evasively omitted from Item 11, Exhibit 1 next reveals **why <u>Fenn</u> won:**

> **<u>Fenn</u> was chosen because [Fenn] <u>stoked</u> the <u>national</u> media fires last year <u>with</u> his $1 million hidden treasure hunt** […] *True West* covered the story in its November 2013 issue.

**It could not be clearer.** Publicity and resultant Participation give the Quest purpose and meaning. Fenn's Arizona reach was so crucial to building those that Fenn accepted, and also **validated**, from Bell and *True West* the Event award **explicitly** for **both Quest and publicity inseparably**, for "**stoking** the **national** media fires" blazing in <u>2013</u> because Tony's **national** story had **ignited** them in <u>August 2012</u>.

**Benchmarking** Tony to Bell and *Newsweek* to *True West* by Fenn's relative efforts and actions now reveals how highly Fenn valued *True West* publicity. The benchmarks are travel, repetition, award, result, and coverage. Fenn valued Tony's national publicity, but benchmarks show Fenn valuing Bell's more. ***<u>(a) Travel</u>:** Fenn won *Newsweek* national publicity in <u>August 2012</u> by **staying home** hosting Tony, but in <u>March 2014</u> — with publicity momentum already, hence award — Fenn **drove** to Arizona for *True West* publicity. Also, the drive's **length** and the stay's **brevity** as cited in Item 11 show Event **importance** and Fenn's **purposefulness.** ***<u>(b) Repetition</u>:** Fenn's Event travel was a

**second** 'drink from the desert well' of *True West* publicity, after the November 2013 feature. Tony wrote a feature and performed a brief newscast, but despite affirming a level of continued Fenn contact, Tony never mentioned other publicity. Though Bell conferred *True West* award, clearly Fenn embraced it by Arizona travel to accept it — showing Fenn wanted more than *True West* feature alone. Fenn's solicitation claim in Item 10 is irrelevant and **emptily true**, like nearly all Fenn's other putatively operative claims — Items 11, 12, 14, 15, and 16 all show **empty semantics, or pretense to meritorious defense.** ***(c) Award:** Bell and *True West*, not Tony and *Newsweek*, gave Fenn a **combined Quest and publicity award.** Fenn likely upgraded the Quest's image by borrowing Bell's credibility, since Tony claimed that before August 2012 Fenn "had no credibility." ***(d) Result:** With the redemption gap, credibly validated performance notice is crucial to contract. I contacted Bell, not Tony, to bridge the gap. Bell was accessible with a visibly strong Fenn relationship and **delivered Solution,** only for Fenn to confirm breach. I Solved, but Fenn still valued Bell more, because Fenn wants fame, Bell helps provide it, and I risk it. ***(e) Coverage:** *Newsweek* is national; *True West* is regional. Fenn worked 'harder' for 'less' coverage, or valued the **regional** coverage **more**. Also, the Quest region excludes Arizona. Why did Fenn travel to Arizona for publicity, unless with purpose for clear results? Fenn uniquely valued what *True West* had to offer — possibly **posthumous fame** ("Fabled Lost Gold in the Rugged West!")

Tony revealed Fenn's aim in publicizing a Quest without wanting it Solved in statement (e): **millennial fame**. Plans to 'die holding the Box' imply more than a mere

redemption gap, such as: no plan to redeem, hapless Participation **without** Solution, and "a thousand years" of **fame**, breaching for **fame** — indeed, **anything** for **fame**. Tony, Bell, Participants, Solver, police, rescuers, Quest casualties, probably lawyers and the Court — we are props in 'Fenn's Quest for **fame**.' Without means of conveyance, the Quest is a hoax (and lacks appeal), but redemption is easy to obscure. Fenn assumed contract operation never would arise or could be semantically frustrated, shirked, or unaccountably escaped as myriad Participants hunted for a Box Fenn contracted to keep.

Feature, Event, Solution delivery, **and posthumous fame prospect by enduring fascination** might show the *True West* relationship Fenn visited Arizona to sustain to be **'continuous' on a bizarre scale** typically associated with Egyptian Pharaohs. Mountains are rock pyramids, Tony used the word "entomb," and people hunt lost gold for centuries. For posthumous fame, key publicity relationships **must** be continuous. Tony affirmed continuity, *True West* benchmarked as more important to Fenn than Tony or my Solving, Bell informally affirmed continuity, and Bell Intermediation hardly would help otherwise.

Jurisdiction stems from **whole context.** Though likely continuous, Bell's Fenn relationship also was **contractually operative, hence jurisdictionally operative.** Bell isn't the only conceivable means of reaching Fenn, but the redemption gap, Item 12, and being ignored combine to show that connecting with Fenn other than by Bell (or suit) likely was futile. Fenn blocks redemption because Fenn doesn't want Solution. Had Fenn not cynically 'redeemed or cashed in Bell' (!) to affirm breach, stage-robbing *True West* of a blockbuster feature ("Legendary Quest — Solved!"), Bell Intermediation might

have been integrally operative, fulfilling contract. After Bell helped Fenn publicize, Fenn repaid by cunning breach, burning both me and Bell, honest Arizonans, at a stroke.

## 5. HELPFUL TIMELINE

To review the salient fact and event chain: (a) Fenn published the Poem in 2010, contracting; (b) By 2012 Fenn was "dying for the publicity," (c) Tony traveled to Fenn in New Mexico for a week to prepare the August 2012 *Newsweek* feature showing Fenn needed not travel for national publicity, (d) The *True West* feature appeared in November 2013; (e) Fenn **re-engaged** with *True West* by March 2014 Arizona Event attendance; (f) Event press stated that Fenn **won Event award because of Quest and publicity together**, confirming Tony's judgment of national impact; (g) Fenn's lengthy drive and brief Event stay showed motivated purpose and value aiming publicity actions into Arizona; (h) Peripherally, *True West* explicitly promoted the Event as near the Tucson Festival of Books at the University of Arizona; (i) I learned of the Quest living and working in Cambodia in 2016, pathfinding the Location's vicinity using a Participant's former blog; (j) Yet ignorant of fact of contract, I eventually Solved, by Location fix in August 2018; (k) I felt that the Box was not abandoned,[11] (l) I traveled to Santa Fe and prioritized reporting in person to a New Mexico State Police Major given public police complaints and Quest casualties, while wondering how to redeem Solution, (m) I sought Fenn connection with difficulty detailed herein; (n) In late 2018 I connected with Bell, (o) Bell intermediated, (p) Fenn responded, sustaining breach and confirming cause of

[11] The riverbank Location is small and bounded. Exhaustive search takes a short time.

suit, (q) I realized the Poem's contractual nature, (r) I filed to Rule 24 intervene in the New Mexico Suit, (s) Required by Rule, I phoned Fenn on December 9, 2019, behaving professionally and respectfully, only for Fenn to ask me in a baffled tone, "Why are you doing this?" (t) **Suit and June 4 Service** followed, (u) **Fenn then 'ended' the long-Solved Quest**, (v) I maintained suit, (w) the June 19 Tony Interview punctured Fenn's credibility, (x) Press reported Fenn to have declined interview, (y) Fenn lawyered up — perhaps as Service motivated 'ending' the Quest, Tony Interview motivated Fenn; (z) on July 22 Fenn rather pointlessly identified "Wyoming" as where the Box was 'found.'

## 6. LAW MEMORANDUM INCLUDING 28 U. S. C. §1631

By Ariz. R. C. P. 4.2(a) courts may exercise personal jurisdiction over nonresident defendants to the U. S. Constitutional maximum. Arizona's long-arm statute ("ALAS") was held to have **broad remedial purpose** allowing jurisdiction over a defendant who "has caused an event to occur in [Arizona] out of which the claim arose" and where claimed breach "touched Arizona."[12] ALAS applied when a defendant purposefully directed activity at Arizona, driving litigation from alleged injuries arising out of or relating to that activity.[13] A defendant's location in a neighboring state favors Arizona jurisdiction.[14] It also was held, of the 'minimum contacts' jurisdiction standard, that

---

[12] *Meyers, Id.*

[13] *Aries v. Palmer Johnson, Inc.*, 153 Ariz. 250, 735 P.2d 1373 (Ct. App. 1987).

[14] *Planning Group of Scottsdale, L.L.C. v. Lake Mathews Mineral Props., Ltd.*, 226 Ariz. 262, 246 P.3d 343 (2011). That state was Calif.; N. M. also neighbors.

**importance**, not number, and **quality**, not quantity, of contacts is persuasive.[15] **Even a single act may establish jurisdiction.**[16] Touchstones include purposeful contact(s) by a defendant's active volition and case facts, as comporting with fair play and substantial justice.[17] Plaintiff has presented facts under affidavit[18] sufficient to shift the onus to Defendant (Fenn) to rebut,[19] as in the Declaration. If jurisdictional facts conflict, the court must resolve in light most favorable to plaintiff.[20] Where jurisdiction turns on disputed questions of fact as intertwined with merits, trial, not motion, must determine.[21] Precedents and standards in *Burger King*, *Schwarzenegger*, *CollegeSource*, and as referenced in *Picot* and in other cases also inform the jurisdiction question.[22]

---

15 *Meyers, Id.*

16 *O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. v. Bonus Utah, Inc.*, 156 Ariz. 171, 750 P.2d 1374 (Ct. App. 1988); *Holmes Tuttle Broadway Ford, Inc. v. Concrete Pumping, Inc.,* 131 Ariz. 232, 639 P.2d 1057 (Ct. App. 1981).

17 *Williams v. Lakeview Co.,* 199 Ariz. 1, 13 P.3d 280 (2000).

18 *Planning Group of Scottsdale, L.L.C. v. Lake Mathews Mineral Props., Ltd.*, 224 Ariz. 306, 230 P.3d 365 (Ct. App. 2010).

19 *MacPherson v. Taglione*, 158 Ariz. 309, 762 P.2d 596 (Ct. App. 1988).

20 *MacPherson, Id.*

21 *Bonner v. Minico, Inc.,* 159 Ariz. 246, 766 P.2d 598 (1988); also see *Rich v. U.S*., 811 F.3d 140 (4th Cir. 2015) holding that when jurisdictional facts intertwine with case merits, discovery might be required to resolve.

22 *Burger King Corp. v. Rudzewicz*, 471 U. S. 462, 105 S.Ct. 2174 (1985); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d. 797 (9th Cir. 2004); *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066 (9th Cir. 2011); *Picot v. Weston,* 780 F.3d 1206 (9th Cir. 2015).

In the alternative, **28 U. S. C. §1631** empowers a court to transfer a case intact to cure want of jurisdiction,[23] in this case by general jurisdiction in the District of New Mexico. **Should the Court deny Arizona jurisdiction, I respectfully request transfer.**

On review I perceive that jurisdictional questions are a contract law staple, core concepts consistently hold, the Court has flexibility to apply law and precedent to jurisdiction in this case to serve justice; and jurisdiction might turn on case-specific facts. The role of a *pro se* litigant is limited in delving subtleties of law surely familiar to an Arizona Federal judge and support team. However, two (2) conclusions of law seem clear, one (1) interpretive and one (1) both textual and precedential. First, given hidden fact of contract, evidence that Fenn neither wanted nor expected Solution, and the Quest's regional nature, no test entailing 'reasonable expectation of being haled into court' in any particular place could apply, as no such expectation could be tenable. **Facts** must hold. Second, given evident case merits, case seriousness including Participant deaths,[24] Fenn's 'precipitous pressers' right after Service indicating awareness that the OC evidences Solution by Location fix, SP motion well-grounded in pivotal events after Service, Fenn's Arizona availment for publicity with relationship continuity for posthumous fame, Fenn's layered subterfuge in intent and contract operation, **breach coextensive with reach, and the alternative of 28 U. S. C. §1631**, dismissal by Jurisdiction Motion would be unjust.

---

[23] *Federal Home Loan Bank of Boston v. Moody's Corp.*, 821 F.3d 102 (1st Cir. 2016).

[24] All press is in Exhibit RM3. AP; *The Salt Lake Tribune*, Mar. 24/26, 2020. "*Dead snowmobile rider was seeking treasure in Utah park*."

## 7. SUMMARY RESPONSE TO DECLARATION OF FORREST FENN

Declaration Items **must** be read with **great word-by-word care**. I do not dispute Items 1, 2, 3, 4, 7, 8, 9, 10, 11, 13, or Fenn's age ("16 #2"), though **crucial** clarifications follow. In Item 4, Fenn's Arizona *True West* relationship is not for "business" but **Quest publicity.** Items 5 and 6 do not **seem** to conflict with my claims: on July 22, Fenn publicly identified "Wyoming" as **Box custody locus**. **Poem, not Memoir, is written contract, with performance by Colorado Location fix as in the OC. Custody locus is irrelevant to Location and performance**. Poem **contractually leads** Solver to Box. Item 10 is true of Memoir, but as Tony affirms, not Quest. Item 11 is critically deficient, as detailed herein. Item 12 mischaracterizes me as "ingratiating," but Fenn generally has ignored me, requiring me to try redemption through Bell as detailed herein. Item 14 is consistent with **unilateral** contract ("…contract **with**?") and my claims — I **emerged** as Solver and valid claimant — and again, **Poem, not Memoir, is written contract**. Item 15 **likely shows Fenn arranged Box retrieval from custody locus to entitle**. I dispute Item 16's **unrecognizable**, misrepresentative "Erskine Site." **Location is exactly where I claimed in OC. Custody locus is irrelevant to Location and performance.**

I ask leave of the Court that I may **elaborate**, in depth or detail, in the proposed Supplementary Pleading. Response is difficult. Fenn often **dodges** my claims. **Fenn is a master of semantics and the Declaration is easy to critically misread. Nowhere does Fenn deny I Solved, including in Item 13, and at times Fenn seems to concede. Fenn knows I Solved and lacks genuine defense. The only meaningful dispute is breach.**

## 8. CONCLUSION

I seek protection of Arizona law: A. R. S. §44-121 "Contracts in writing; consideration. Every contract in writing imports a consideration."

For the foregoing reasons, I respectfully request that the Court sustain Arizona jurisdiction, denying dismissal by Defendant's Jurisdiction Motion.

In the alternative, I request by 28 U. S. C. §1631 that the Court transfer intact to the District of New Mexico to cure by general jurisdiction, thus also denying dismissal by Defendant's Jurisdiction Motion.

Respectfully submitted this 26th day of July, 2020.

Brian Erskine
Plaintiff
1338 Sabatina Street
Prescott, Arizona 86301-7402
(949) 424-4294
kattigara@gmail.com

## EXHIBIT LIST

1. Contract Summary
2. Tony Interview Transcript by Plaintiff
3. Press articles, press excerpts, or press citations: *The Santa Fe New Mexican, NPR, Newsweek, True West, Alta, The Salt Lake Tribune*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2020, I caused the foregoing to be electronically filed with the Clerk using the CM/ECF system, which will serve notice of such filing to counsel of record and the Court Monitor to their registered electronic mail addresses:

James W. Armstrong
Brian E. Ditsch
SACKS TIERNEY, P. A.

Karl Sommer
SOMMER KARNES AND ASSOCIATES LLP
*Pro Hac Vice*

*Attorneys for Defendant*

Brian Erskine
Plaintiff
1338 Sabatina Street
Prescott, Arizona 86301-7402
(949) 424-4294
kattigara@gmail.com